IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


SPETHMAN V. SPETHMAN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


ANGELINA LEIGH SPETHMAN, APPELLANT,

V.

THOMAS EDWARD SPETHMAN, APPELLEE.


Filed August 22, 2017.    No. A-16-292.


Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge.
Affirmed.

Jon J. Puk, of Woodke & Gibbons, P.C., L.L.O., for appellant.

Brent M. Kuhn, of Brent Kuhn Law, for appellee.


MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

The marriage of Angelina Leigh Spethman and Thomas Edward Spethman was dissolved by decree on December 21, 2015. Angelina appeals portions of that decree entered by the Douglas County District Court, namely its award of joint physical custody and the associated parenting schedule, and its exclusion of certain evidence. We affirm.

BACKGROUND

Angelina and Thomas were married in 2001 and had five children during their marriage. (By the time of trial, the children's ages ranged from 2 to 11 years old.) Angelina filed for divorce in October 2014. Both parties continued living in the family residence on an agreed-upon schedule until Angelina moved into a separate residence 1½ miles away in February 2015. Both parties filed motions for temporary relief and the district court entered a temporary order on July 28, 2015. That

- 1 -

order reflects that the parties had appeared before the court on February 9, and the court "made certain rulings at that time." The matter came before the court again on April 28, "as no Temporary Order had been entered." At this later hearing, affidavits were received and arguments were made by counsel, but "[t]he matter was not placed on the record." (To the extent a record was made of the February 9 hearing, it is not contained in the record before this court.) According to a motion filed by Angelina on April 22, Thomas' attorney was to have prepared the temporary order from the court's ruling after the February 9 hearing, but had not done so. Angelina's April 22 motion further alleged that "the parenting time this Court ordered on joint legal and joint physical [sic], with 7 days on to [Angelina] and 7 days on to [Thomas], is not working and is not in the best interests of the minor children and that the parties should due [sic] a schedule of 2-2-3[.]" According to Angelina's motion, the preferred rotating 2-week schedule would place the children with Thomas on Monday and Tuesday, with Angelina on Wednesday and Thursday, and with Thomas for the weekend in Week 1; and, in Week 2, the children would be with Angelina on Monday and Tuesday, with Thomas on Wednesday and Thursday, and with Angelina for the weekend.

The district court's July 28, 2015, temporary order awarded Angelina and Thomas joint legal and joint physical custody of their five children. Parenting time was allocated between the parties on a weekly basis, with each parent's time commencing on alternating Sunday evenings. The parent not exercising parenting time during the week was given time with the children on Thursday evening from 4:30 p.m. to 8:30 p.m. Other matters were also addressed in the temporary order, but are not pertinent to the issues on appeal.

Trial took place November 23 and 24, and December 3, 2015. We will discuss the trial evidence relevant to the errors assigned in our analysis below. A decree dissolving the marriage was entered by the district court on December 21.

Relevant to this appeal, the decree reflects that the district court found both parents were fit and proper persons to be awarded the custody and care of the children, and that the parties stipulated to joint legal custody. The court concluded it was in the children's best interests for the parties to be awarded joint legal and joint physical custody of the children. The district court ordered that parenting time would be allocated as previously set forth in the temporary order (commencing on Sunday and alternating weekly), and midweek parenting time would be on Thursday from 4 p.m. to 8 p.m.

On December 30, 2015, Angelina filed a motion to amend or alter the court's order, requesting, as pertinent here, that the court award physical custody of the children to her, but if the court was not willing to do that, then to amend the parenting time to a "2-2 and 3 (every other weekend Friday to Monday) schedule." The district court entered an order overruling the motion on February 18, 2016. Angelina timely appealed.

ASSIGNMENTS OF ERROR

Restated, Angelina assigns that the district court erred by: (1) excluding evidence of sexual and intimate partner abuse during the marriage; (2) awarding Thomas joint physical custody of their children; and (3) awarding alternating 7-day periods of parenting time.

## STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015).

## ANALYSIS

### EXCLUDED EVIDENCE

Angelina argues that the district court improperly excluded credible evidence of domestic intimate partner abuse, and that this was contrary to Neb. Rev. Stat. § 43-2932 (Reissue 2016). The evidence she sought to admit pertained to Thomas having sex with her while she was asleep, and that he admitted this to his counselors. In addition to her own attempt to testify on this matter, Angelina sought to elicit testimony on the subject from: Thomas' mental health therapist at Catholic Charities, Alberta Vasarkovy; Angelina's friend, Melissa Atwell; and through the deposition testimony of Joyce Sasse (exhibit 90), an advanced practice registered nurse certified in psychiatry for adult practice at Woodhaven Counseling Associates, Inc. Angelina also attempted to offer the counseling records associated with Vasarkovy (exhibit 2) and Sasse (exhibit 1). The district court reviewed and received exhibit 90 (Sasse's deposition included a copy of exhibit 1), but excluded consideration of any evidence it deemed not relevant, or if the probative value was outweighed by any prejudicial effect. Exhibit 2 was excluded for lack of foundation. As pertinent here, the records for Vasarkovy and Sasse, and the offer of proof of Atwell's testimony, indicate that on at least one occasion, Thomas placed Angelina's sleeping medication in her drink and had sex with her after she fell asleep.

We first address the district court's exclusion of exhibit 2 for lack of proper foundation. Vasarkovy testified she was not responsible for preparing the records contained in the exhibit, nor was she the custodian of the records; we find no error with this evidentiary ruling. Further, much

of what was contained in exhibit 2 was admitted through Vasarkovy's testimony. Vasarkovy, who had worked as a mental health therapist with Catholic Charities for 20 years, testified that she provided counseling to Thomas related to alcohol issues and difficulties he was having with Angelina. Vasarkovy testified, without objection, that when Thomas first began seeing her in January 2013, he shared that there was "a recurring problem between he and his wife sharing something intimate and not acknowledging it. He share[d] it [was] hurtful and it [would] lead to separation or divorce[.]" Vasarkovy met with Thomas and Angelina "a number of times[.]" Vasarkovy stated that both Thomas and Angelina talked about issues affecting both of them, and she made recommendations to both, including suggesting to Angelina that she get help with "abuse in her history," because Vasarkovy "felt it was impacting the intimacy issues between them." However, according to Vasarkovy, Angelina shared with her that she had gone to a counselor and it had not been a good experience, "so she didn't really care to go back." Vasarkovy acknowledged that she had recommended that Thomas and Angelina sleep in different rooms "[b]ecause there was a struggle with them being able to be amicable together and be able to sleep peacefully. It seemed that [Thomas] was touching [Angelina] in sleep at night, and that was something that Angel[ina] felt uncomfortable with. And I wanted to give them some space to work on their relationship without further stress." Vasarkovy stated that she was working with Thomas and his "ADHD," and acknowledged working with him on alcohol issues, but stated that she "never saw [Thomas] as having a severe drinking problem." Vasarkovy said that Thomas was "a different person today than when he first came for counseling."

As to Sasse's deposition testimony (exhibit 90) and records (exhibit 1), the district court stated that it excluded consideration of any evidence therein that it deemed not relevant, or if the probative value was outweighed by any prejudicial effect. In this court's review of that evidence, we note that Sasse met primarily with Thomas for counseling and to manage his prescriptions, although Angelina "would occasionally come in." It was Sasse's understanding that Thomas and Angelina were in "couples counseling" with Vasarkovy. Sasse met with Thomas from May 2013 to January 2015, and most of her testimony pertains to adjusting and changing medications, and Thomas' efforts to address his alcohol usage. As for sexual matters between Thomas and Angelina, her testimony aligned with that provided by Vasarkovy, as she and Vasarkovy "worked together to try and help Tom." Sasse and Vasarkovy had worked together for 5 years at Catholic Charities, and Sasse found her to be "a very trustworthy therapist," and they continued to share patients, including Thomas.

As for the court's exclusion of evidence related to Thomas' past sexual conduct, the district court concluded the evidence was not relevant since there was no showing of any nexus between the alleged behavior and any impact on Thomas' parenting, and even if the evidence was relevant, the court concluded that the danger of unfair prejudice outweighed the probative value of the evidence.

Angelina asserts that this evidence of "sexual abuse by [Thomas] against [Angelina] should have been considered by the Court in its ruling on custody and not been excluded." Brief for appellant at 26. Angelina contends that "[o]ne who commits such acts should not be a physical custodian of the children[.]" *Id*. She also argues that "had the District Court allowed the evidence

in, it would be required to make written findings required by § 43-2932(3) before awarding joint physical custody." Brief for appellant at 21.

Thomas asserts that "[a]lthough Angelina complained that there were incidents of sexual contact between her and her husband during the marriage which she deemed abusive, she offered no evidence that she took any legal action at the time of the alleged incidents to file any legal proceedings either civil or criminal against her husband for any such alleged contact." Brief for appellee at 10. He also argues that Angelina failed to "offer any evidence of how her complaints of this conduct would have impacted the minor children or the parenting of the minor children," and that the offers of proof failed to make any such connection. *Id.*

Section 43-2932 states in relevant part:

(1) When the court is required to develop a parenting plan: (a) If a preponderance of the evidence demonstrates, the court shall determine whether a parent who would otherwise be allocated custody, parenting time, visitation, or other access to the child under a parenting plan: (i) Has committed child abuse or neglect; (ii) Has committed child abandonment under section 28-705; (iii) Has committed domestic intimate partner abuse; or (iv) Has interfered persistently with the other parent's access to the child, except in the case . . . (b) If a parent is found to have engaged in any activity specified by subdivision (1)(a) of this section, limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm. . . .

. . . .

(3) If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

When a parent's commission of one of the listed actions in § 43-2932 is established by a preponderance of the evidence, the court must make a determination to that effect. See *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). Such a finding, in turn, obligates the court to impose any necessary limitations on custody, parenting time, and visitation and to make specific written findings prior to awarding legal or physical custody to the parent who committed the listed action. *Id.*

In *Flores v. Flores-Guerrero, supra*, a district court awarded joint physical custody in a modification action without making written findings regarding the father's conviction for third degree domestic assault against the mother of the children at issue. Our Supreme Court held that it was an abuse of discretion for the district court to make a custody determination without complying with § 43-2932 since the greater weight of the evidence in that case demonstrated that the father had committed domestic intimate partner abuse. The district court had received certified copies of an order sentencing the father to probation for his conviction for third degree domestic assault, a conviction affirmed by this court on appeal.

It is evident that § 43-2932 is designed to protect a child and/or a child's parent from potential harm by the other parent as a result of that other parent's past harmful conduct. The statute specifically tasks the court, when developing a parenting plan, to impose any necessary conditions on custody, parenting time, or other access, so that the child and parent can be adequately protected from harm by the other parent. In the case before us, the district court was not presented with the type of evidence noted in *Flores v. Flores-Guerrero, supra*; and further, the district court concluded the proffered evidence was not sufficiently relevant for the court to receive.

This court's de novo review of the record does not reveal any evidence to establish a nexus between Thomas' past conduct and his parenting of the children. Nor does the record reveal any nexus between Thomas' past conduct and his ability to coparent with Angelina. In fact, from October 2014 to February 2015, they coparented their children by sharing the family residence, each coming and going on their established schedule. In February, they began parenting the children on an alternating weekly schedule based upon a verbal order by the district court. All of the proffered evidence of Thomas' past sexual conduct preceded this point in time. Nevertheless, in April, when Angelina filed a motion seeking the entry of a written temporary order, Angelina's only allegation regarding sharing physical custody with Thomas was that she believed the parenting schedule should be a "2-2-3" schedule rather than the alternating weekly schedule ordered by the court. There were no allegations in that motion related to Thomas' past sexual conduct affecting Thomas' parenting or Angelina's ability to coparent with him, and there were no requests for safety provisions for Angelina and/or the children. Angelina failed to offer any evidence connecting Thomas' past conduct to his parenting of the children, or to her ability to coparent with him, either preceding the temporary order or since its entry. Accordingly, a deeper examination of that conduct under § 43-2932 was not warranted, and the district court did not abuse its discretion by excluding the challenged evidence on the basis of relevancy.

Angelina also argues that Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) makes evidence of domestic intimate partner abuse relevant to the court's determination of custody and a parenting plan. Section 43-2923(6) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and: (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (c) The general health, welfare, and social behavior of the minor child; (d) Credible evidence of abuse inflicted on any family or household member. . . ; and (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

There is nothing in the record or the court's order to indicate the district court did not consider the best interests of the children, including the factors set forth in § 43-2923(6), when making its joint physical custody decision, which we address next.

AWARD OF JOINT PHYSICAL CUSTODY

The district court found that both Thomas and Angelina were fit parents, and that joint legal and physical custody was in the best interests of the children. Although Angelina agreed to joint legal custody, she contends that she should have received sole physical custody of the children. She ties her arguments for this assignment of error to those she made for the erroneous exclusion of evidence, which we have already addressed. However, Angelina claims that even without such evidence, the district court's award of joint physical custody is contrary to the evidence, and this court's de novo review of the evidence in the record should result in primary physical custody being awarded to her. But in order for this court to reverse a district court's decision on physical custody, our review of the evidence would have to show that the district court abused its discretion in deciding the way it did. Such matters are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

Nebraska's Parenting Act defines joint physical custody as "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Reissue 2016). The paramount consideration in determining child custody is the best interests of the children. *Donald v. Donald*, *supra*.

In support of her argument for sole physical custody, Angelina claims that Thomas: has denied her telephone access to the children; has made derogatory comments to her in front of the children and with business contacts; has been unable to care for the five children; has not paid attention to the school schedule to assure their safety upon dropping them off; has left "the children ages 4, 6[,] and 7 home alone to fend for themselves"; has left a pot of boiling water on the stove; has "ADHD" which clouds his judgment; is unwilling to communicate with her about educational matters for the children or counseling at school; and has walked into her home unannounced. Brief for appellant at 22.

As previously noted, Angelina and Thomas continued to live together from the time the divorce action was filed in October 2014 until Angelina moved out in February 2015. They agreed on who would be in the house when, but according to Angelina, Thomas sometimes did not leave the house on time and would often work in the basement until 11 p.m. or midnight, and then return to the house the next day. One morning during this interim period, Angelina arrived at the family home as Thomas was preparing to leave for a meeting in Lincoln. Angelina said that Thomas mixed one of the children's "ADHD" medicine with Kool-Aid, as was custom, and placed it on the kitchen counter without informing Angelina. Angelina later mixed another dose of the medicine and gave it to the child for whom it was prescribed. At some point during the morning, Angelina discovered that another child (their youngest) had crawled up onto the countertop and drank the Kool-Aid with ADHD medicine previously mixed into it by Thomas. From her testimony, it appears that Angelina holds Thomas responsible for the incident, saying that "Thomas did leave the house without bringing the 18-month-old upstairs or without telling me he was leaving."

Angelina also described an incident from December 2014 when Thomas left the house with a pot of boiling water on the stove while all five children were home and while Angelina was in the shower. Angelina said that when she went downstairs after her shower, "there was a pot of macaroni on the stove. He left the house while boiling macaroni." She claimed that Thomas said he did not remember leaving the boiling water on the stove when he left the house. Thomas pointed out that in the prior month, one of their children had been burned while under Angelina's supervision. Apparently the child reached up onto the stove and grabbed a pot of boiling water while Angelina was standing at the stove. Angelina acknowledged this separate incident, saying that the child "pushed up a stool to peek at what was for dinner and she had crawled up on the stool and then just grabbed the handle, and it just tipped to where it rolled down her sleeve."

In February 2015, Angelina moved into a home 1½ miles away. She testified that Thomas would "find a reason to come over to my house" when he was supervising the children. She said that he would let the children play in the circle at Angelina's house, but he also began asking Angelina to supervise the children during his parenting time. Angelina also testified that Thomas entered her new home uninvited on at least one occasion. Angelina said that she was home sick one day when she heard the door open. She called out, asking who was in the home, and it was Thomas claiming he was there to get shoes for the children. "And he apparently grabbed shoes and left." Angelina said that Thomas had behaved in a similar fashion on more than one occasion and did not stop until they communicated about it through counsel.

Thomas also came over to Angelina's home on Halloween 2015, when it was her parenting week. Thomas had a golf cart and told Angelina that he wanted to give each of their children a ride in the cart. Angelina allowed Thomas to provide rides to the children, but expressed her concern that Thomas had come over uninvited during her parenting time.

Also after Angelina moved out, she testified that Thomas did not answer her phone calls, saying "90 percent of the time that I called Thomas's phone" he would not answer the phone or he would hand the phone to their youngest child, who was too young to speak. She also alleged that when she left a message, Thomas would usually not return her calls. During the two months preceding the trial, Angelina said that Thomas would not answer any of her phone calls, and when they would exchange the children, he refused to talk to her, telling her to speak to his attorney.

In July 2015, Thomas' babysitter refused to let Angelina speak with the children even after Angelina told the babysitter her identity. Angelina said she immediately called Thomas, but Thomas did not answer the phone. Thomas later sent an email apology and told Angelina that the babysitter would not prevent Angelina from speaking with the children in the future. According to Angelina, no babysitter ever prevented her from talking to the children again.

Thomas testified that he has a "hard line" telephone which the children may use at any time to contact their mother. He said that "the issue is that my wife has repeatedly stated that she's made phone calls to me on a regular basis" to try and have the children speak with her, which Thomas said was not the case. Thomas did acknowledge that there are "some minor times where everyone else is getting ready, and, yes, I have given the phone to [the youngest child] because he can hear Mom's voice on the phone." Thomas also recognized that he is responsible for telling the children when Angelina is on the phone.

Angelina testified that Thomas calls her names in front of the children and has her contact information listed under an offensive term in his cell phone. She also alleged that he would call her names in public. Angelina's sister testified that Thomas would call Angelina "very vulgar names" in public. Thomas acknowledged the name calling during cross-examination and he promised to refrain from such conduct in the future.

Angelina alleged that Thomas "would not pay attention to the school schedule to assure their (the children's) safety upon dropping them off at school." At trial, Angelina testified that the dean of the children's preschool called "numerous times" to inform her that no one had arrived to pick up the children. Angelina also discussed an incident in August 2015 where the babysitter Thomas hired dropped one of the children off at preschool 30 minutes early, which was against the preschool's procedures.

Also in August 2015, while the children were in Thomas' care, Angelina went over to Thomas' house and discovered that Thomas had left three of the children home alone. Angelina said she attempted to call Thomas, but that her call went straight to voicemail. Since she was unable to contact Thomas, Angelina took the children to her mother's house. Thomas called back 19 minutes later and said that he had been on a walk around the block with the other children.

Angelina expressed concern about Thomas' parenting ability because of his "ADHD" diagnosis. Angelina said that Thomas was unable to wake up when his alarm went off for approximately the past four years. Angelina would wake up, get the children ready, and then go and wake up Thomas. She also testified that she would sometimes need to call Thomas and remind him to pick up the children.

Sasse's deposition testimony reflects a diagnosis for Thomas of attention deficit hyperactivity disorder (ADHD). She noted that in May 2013, Thomas said he had a "hard time getting up the ambition to get up and get going in the morning[,]" and that he had trouble falling asleep. Thomas also told her that he had trouble concentrating, thinking, making decisions, and with memory. By July 2013, his focus and concentration were good. Thomas testified that his ADHD affects his focus and scheduling, but that he has been on medication to manage his symptoms.

Angelina described herself as the primary caregiver to the children. Angelina said Thomas made one or two meals per month and that he rarely helped bathe the children. Angelina did laundry, vacuumed, mopped the floors, and cleaned the toilets and gutters. Thomas disagreed with the characterization of Angelina as the primary caregiver, saying "I've had an active role in my children's upbringing. I come from a large family, so I know that Mom and Dad have to support each other in order to raise our children."

Angelina testified that joint legal custody was in the best interests of the children but that joint physical custody was not. When asked why joint physical custody was not in the children's best interests, she said that

> [t]here's not consistency with Thomas. I - from day one, I've raised these kids with his help, but I've been the primary caregiver, the person that seeks education with them, I've taken care of all of their needs. He's [Thomas] is unwilling to work with me, with the children, and I don't know if that's out of spite or if he's hurt right now, but there isn't an ability to cooperate or even speak civilly with each other at this point.

Based on Angelina's testimony, Thomas frequently talks about her "relationships or [her] current relationship with [her] current boyfriend[.]" She acknowledged she had another person in her life and she has "moved on." It is clear from the evidence that Thomas has had difficulty coping with the changing dynamics of his family situation, however, he was engaged in counseling to assist him, and according to Vasarkovy at the time of trial, Thomas was "a different person today than when he first came for counseling."

Our de novo review of the record reveals two parents trying very hard to juggle the demands of five children while also running a business. Thomas and Angelina are equal owners of a Signal 88 security franchise, incorporated as Vector Security, Inc. Prior to separating, Angelina primarily handled the financial aspects of the business, while Thomas focused on sales and client development. Although being owners of the business allowed them both some flexibility in scheduling their work time, certain contracts could demand 40 or more hours per week, such as during Nebraska football season. Angelina also works part-time for Kohll's Pharmacy, and occasionally at a bar. Thomas also picks up part-time seasonal work for a friend when needed.

In the course of managing the significant responsibilities associated with their personal and professional lives, they have also had to contend with the breakdown of their marriage. Mistakes have been made or in some cases, poor judgment exercised, by both parties. Each has engaged in unfavorable behaviors, but the evidence supports that both love their children and do their best to take care of their needs. Despite her concern about sharing joint physical custody, even Angelina testified that Thomas was "a good provider and he does love his children." We find no abuse of discretion by the district court in awarding joint physical custody.

PARENTING TIME

Parenting time was allocated between the parties on a weekly basis, with each parent's time with the children commencing on alternating Sunday evenings. Midweek parenting time from 4 p.m. to 8 p.m. on Thursday was awarded to the parent not exercising his or her weekly parenting time. The district court specifically stated that it "found this parenting plan to be in the best interests of the minor children at the present time." Angelina disagrees. She argues that in the event this court does not reverse the award of joint physical custody, which we have not, we should "mandate a change in the parenting time" so that each parent sees the children more often than every other week. Brief for appellant at 27. She suggests that parenting time should be amended to a "2-2-3 schedule," with weekends rotated every other weekend from Friday to Monday. *Id*. She argues that the children have never gone one day without seeing her until the divorce and, due to their young ages, they should not be away from either parent for 7 days at a time.

Thomas believes the current schedule is preferable because it limits transitions, provides stability in the management of their five minor children, and it keeps the children from feeling like they are "living out of a suitcase by going back and forth multiple times during the week." Brief for appellee at 11.

Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

The children had been spending time with each parent in an alternating weekly manner since February 2015, and despite Angelina's claim in April that the schedule was "not working" and that a "2-2-3" schedule would be better, the district court nevertheless maintained the alternating weekly schedule in its July temporary order. There was no evidence offered at trial to indicate this allocation of parenting time was adversely impacting the children. Further, the parenting plan allows the parent not exercising weekly parenting time to enjoy 4 hours with the children during the week on Thursday evening. This means that after concluding a week of parenting time on Sunday evening, that parent will see the children again in 4 days. Under Angelina's proposed "2-2-3" schedule, each parent would have to go 3 days without seeing the children during the other parent's weekend parenting time. While Angelina's preference for one less day apart from the children is certainly understandable, her proposed parenting schedule also increases the number of transitions between households. The longer, settled periods of time at each parent's home under the alternating weekly schedule will allow for more quality time in each household since it will reduce the frequency and time necessary to get five children packed up with personal, school, and other miscellaneous items. The district court's decision to order alternating weekly parenting time was not an abuse of discretion.

## CONCLUSION

The decree of dissolution entered by the district court is affirmed.

AFFIRMED.